UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
RICHARD JOHN HAMEDL and CAROL RYDER
HAMEDL (a.k.a. CAROL RYDER and CAROL HAMEDL),

                              Plaintiffs,

          -against-

DR. EDWARD M. WEILAND, LONG ISLAND
INTEGRATED MEDICAL GROUP, VERIZON
COMMUNICATIONS, INC., JOHN DOE, JANE DOE,
and JOE DOE, in their official and personal capacities,

                              Defendants.
---------------------------------------------------------------X

**MEMORANDUM AND ORDER**

10-CV-2738 (SJF)(GRB)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E D N Y
★ SEP 06 2012 ★
LONG ISLAND OFFICE

FEUERSTEIN, United States District Judge:

Plaintiff Richard John Hamedl ("plaintiff") and his wife, Carol Ryder Hamedl,[1] commenced this action on June 15, 2010. [Docket Entry No. 1]. On October 15, 2010, an amended complaint was filed against defendants Dr. Edward M. Weiland ("Doctor Weiland" or "Weiland"), Long Island Integrated Medical Group, Verizon Communications, Inc., "Metropolitan Life Assurance Company," The Communication Workers of America, and individual defendants Ariadne Staples ("Staples"), Linda Mikalik ("Mikalik"), Jim Arnone ("Arnone"), John Croke ("Croke"), Roland Morgan ("Morgan"), and Nancy Branham ("Branham"), in their personal and professional capacities, as well as John and Jane Doe

---

[1] Carol Ryder Hamedl has withdrawn what appears to have been her only cause of action. [Docket Entry No. 138 at 1]. As the remaining claims appear to be asserted by Richard Hamedl alone, Richard Hamedl will be referred to herein as "plaintiff."

1

defendants.[2] The amended complaint alleged, inter alia, disability discrimination in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12112 et seq. ("ADA"), gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"), fraud, and breach of contract. [Docket Entry No. 2].

Presently before the Court are remaining defendants' motions for summary judgment. [Docket Entry Nos. 119, 127]. For the reasons that follow, the motions are GRANTED in their entirety.

I. Factual Background

A. Plaintiff's Medical History and Requests for Accommodation

The following facts are not in dispute unless otherwise noted. Plaintiff is a forty-nine (49) year old male. Verizon's Statement Pursuant to Local Civil Rule 56.1 ("Verizon 56.1 Stat.") [Docket Entry No. 129] at ¶ 1. From September 24, 1995 to November 20, 2008, he was employed by Verizon New York, Inc. ("Verizon") as a Central Office Technician in the company's Installation and Maintenance Department. Id. at ¶¶ 8, 10. Prior to his employment with Verizon, plaintiff was employed by the International Brotherhood of Electrical Workers

---

[2] All claims against "Metropolitan Life Assurance Company" and Staples were voluntarily discontinued on December 22, 2011. [Docket Entry Nos. 115, 117]. All claims against defendants Arnone, Mikalik, and Croke were voluntarily discontinued on January 24, 2012. [Docket Entry Nos. 118, 135]. By that same stipulation, plaintiff also voluntarily withdrew a number of additional claims against all defendants. Id. All claims against defendants The Communication Workers of America, Branham, and Morgan were voluntarily discontinued on March 22, 2012. [Docket Entry Nos. 142, 143]. The caption has been amended accordingly.

("IBEW") for almost eight (8) years. Id. at ¶ 6.

According to plaintiff, he suffers from "serious health conditions and/or injuries," including "damage to disks in his back and neck, arthritis, and a significant foot injury." Plaintiff's Brief in Opposition to Verizon's Motion for Summary Judgment ("Pl. Opp.") [Docket Entry No. 138] at 2. During plaintiff's employment with Verizon, he requested that the company provide various accommodations for his alleged medical conditions. In or around 2004 or 2005, he requested that he be assigned to work the midnight to 8:00 a.m. shift (the "midnight tour" or "midnight shift"), claiming that his commute to and from work during those hours would be shorter, preventing him from remaining sedentary for "extended periods of time." Pl. Opp. at 3; see also Plaintiff's Counterstatement Pursuant to Local Civil Rule 56.1 ("Pl. Ctrstmt.") [Docket Entry No. 137] at ¶ 89. At that time, there were four (4) shifts to which employees in plaintiff's department were assigned: 8:00 a.m. to 5:00 p.m., 11:00 a.m. to 7:00 p.m., 4:00 p.m. to midnight, and midnight to 8:00 a.m. Verizon 56.1 Stat. at ¶ 47. The midnight tour was in relatively high demand because those who worked it were paid a "premium" rate. Id. at ¶ 50.

Until April 2005, plaintiff's labor union, the Communication Workers of America Local 1101 ("Local 1101"), was responsible for assigning employees in plaintiff's department to a particular tour of duty. Declaration of Jennifer Dixon ("Dixon Dec.") [Docket Entry No. 132] at ¶¶ 13-14. In April 2005, however, that responsibility was shifted to Verizon management. Id. at ¶ 14. Verizon's practice was to assign tours of duty in accordance with an employee's preferences and his or her seniority. Id. at ¶ 15.[3]

---

[3] As a Verizon employee, plaintiff was eligible for certain benefits under the Verizon Pension Plan for New York and New England ("Pension Plan"). See Verizon 56.1 Stat. at ¶¶ 24-25. The Pension Plan sets forth the rules for calculating a Verizon employee's "Net Credited

3

Local 1101 maintained an employee seniority list, which listed plaintiff's NCSD as January 6, 1986. Id. at ¶¶ 16-18. After Verizon became responsible for tour assignments in April 2005, plaintiff's supervisor relied upon this date without verifying it independently. Id. at ¶¶ 17-18. However, the labor union's January 6, 1986 date was inconsistent with internal Verizon documents calculating plaintiff's NCSD to be February 17, 1994. See, e.g., Declaration of Daniel Fleming ("Fleming Dec."), Ex. C [Docket Entry No. 131-3]; Fleming Dec. Ex. E [Docket Entry No. 131-3]; Declaration of Wilfrido Garcia ("Garcia Dec."), Ex. B [Docket Entry No. 134-1]. Defendants now believe that the union's date was incorrect and that Verizon employees adopted it in error. See Fleming Dec. at ¶ 14; Dixon Dec. at ¶¶ 18-19; Garcia Dec. at ¶ 9.

Plaintiff was assigned to the midnight tour until 2007, at which point he injured himself cutting down a tree at his home. Verizon 56.1 Stat. at ¶ 81. Plaintiff then applied for, and was granted, FMLA leave from June through October of that year. Id. at ¶ 82. While plaintiff was out on FMLA leave, shop stewards from Local 1101 learned that Verizon had calculated plaintiff's NCSD to be February 17, 1994, not January 6, 1986. Id. at ¶¶ 83-84.[4] After this discrepancy came to Verizon's attention, it reevaluated plaintiff's seniority status, and found that plaintiff was no longer eligible to be assigned to a spot on the midnight tour. See Verizon 56.1

---

Service Date" ("NCSD"), which provides the basis for determining employee seniority, annual vacation day entitlements, and tour of duty assignments. Id. at ¶¶ 22, 24. Under the terms of the Pension Plan, an employee who previously worked for a "Participating Company" is eligible to have their service at that company credited toward their NCSD. Id. at ¶ 26. The IBEW is not a "Participating Company" as that term is defined in the Pension Plan. Id. at ¶ 30.

[4] As discussed infra, plaintiff disputes Verizon's calculation. He argues that he was deprived of more than eight (8) years' seniority as retaliation for having taken FMLA leave.

Stat. at ¶ 86; Garcia Dec., Ex. C; Dixon Dec. at ¶ 19.

After plaintiff returned to work, a supervisor in the Installation and Maintenance Department informed him that he would be removed from the midnight tour and reassigned to a daytime tour, from 8:00 a.m. to 5:00 p.m., beginning November 5, 2007. Verizon 56.1 Stat. at ¶ 86. Plaintiff responded that he would be calling out ill because he was unable to work during the day. Id. at ¶ 87. However, plaintiff requested, and was permitted, to work a modified daytime shift beginning at 6:00 a.m. in order to avoid travel during rush hour. Id. at ¶¶ 89-90.[5]

At some point in 2007,[6] plaintiff also requested that Verizon purchase an ergonomic chair for use at his desk. Id. at ¶ 63. In accordance with company policy, Dixon opened a "claim file" with MetLife,[7] and MetLife acknowledged the request in a letter dated November 20, 2007. Id. at ¶¶ 64-65. Plaintiff attended an "ergonomic assessment" on December 12, 2007, and MetLife recommended that Verizon purchase the chair. Id. at ¶¶ 66-68. On December 24, 2007, Verizon submitted a "work order request" for the chair, which arrived at plaintiff's office on February 15, 2008. Id. at ¶¶ 69-70.

On February 12, 2008, plaintiff left work. Plaintiff claims that he was forced to leave work because he was unable to work the modified day tour and because he had not yet been

---

[5] The parties dispute plaintiff's start time under the modified day tour: while Verizon appears to claim that plaintiff was permitted to begin work at 5:30 a.m., plaintiff alleges that his shift did not begin until 6:00 a.m. Pl. Ctrstmt. at ¶ 90. For the purposes of this motion, the Court will resolve this question in favor of plaintiff and assume that the shift start time was 6:00 a.m.

[6] While Verizon appears to allege that plaintiff did not request the ergonomic chair until November 2007, Verizon 56.1 Stat. at ¶ 63, plaintiff claims that he first requested the chair in July 2007, Pl. Ctrstmt. at ¶ 63.

[7] Former defendant Metropolitan Life Insurance Company ("MetLife") is Verizon's administrator of disability benefits. Verizon 56.1 Stat. at ¶ 53.

5

provided the ergonomic chair. Pl. Opp. at 4. It appears that plaintiff began receiving short-term disability payments[8] around the time he stopped working in February 2008, see Weiland Ex. J, and that MetLife subsequently required him to attend medical examinations for the purpose of certifying that he was disabled.

B. Plaintiff's Interactions with Doctor Weiland

Defendant Edward Weiland, M.D. is a board certified neurologist who was retained to perform an independent medical examination ("IME") of plaintiff. Defendant Weiland's Rule 56.1 Statement ("Weiland 56.1 Stat.") [Docket Entry No. 120] at ¶¶ 4-5. Weiland was retained by an entity named Medical Consultants Network ("MCN") as an independent contractor, and never had any direct contact with MetLife concerning plaintiff. Id. at ¶¶ 5, 10. Doctor Weiland performed the examination on May 22, 2008, and after completing the exam, he dictated a report summarizing his findings over the telephone to a transcription service. Id. at ¶ 8. In his report, Weiland stated that he could "find no evidence of any lateralizing neurologic deficits at the present time to correlate with the claimant's multiple neuromuscular complaints." Weiland Ex. D [Docket Entry No. 119-5] at 6. He further stated that he "[saw] no reason why [plaintiff] should not be able to perform the activities of daily living and return to gainful employment performing sedentary activities." Id. This was the only occasion on which Doctor Weiland examined plaintiff. Weiland 56.1 Stat. at ¶ 14.

---

[8] Verizon employees who are certified as disabled are entitled to receive short-term disability payments for up to fifty-two (52) weeks. Ver. 56.1 Stat. at ¶ 96. At the end of those fifty-two (52) weeks, employees who remain disabled due to illness or an off-duty injury may then become eligible for long-term disability benefits and/or pension benefits. Id. at ¶ 97.

C. Plaintiff's Application for Disability Benefits, Discrimination Complaint, and Dispute Over Plaintiff's NCSD

By letter dated June 5, 2008, MetLife notified plaintiff that it was discontinuing short-term disability payments as of June 2, 2008. Weiland Ex. J [Docket Entry No. 119-11]. Referencing Doctor Weiland's report, the letter states that plaintiff's claim "lacked sufficient medical evidence supporting a functional impairment that would prevent [him] from performing the essential duties of [his] sedentary job duties as a Central Office Technician." Id.

In July 2008, plaintiff's labor union arranged for him to be examined by a psychiatrist. See Weiland Ex. L [Docket Entry No. 119-15]. As a result of this examination, plaintiff was deemed disabled. Weiland 56.1 Stat. at ¶ 13. Plaintiff remained on short-term disability leave through November 20, 2008. Pl. Ctrstmt. at ¶ 19.

On or about June 26, 2008, plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR"), asserting claims of disability discrimination and retaliation. Declaration of Linda Mikalik, Ex. A [Docket Entry No. 133-1]. By Determination and Order dated September 2, 2009, the NYSDHR dismissed plaintiff's complaint for lack of probable cause. Id. at Ex. F [Docket Entry No. 133-3].

In or around August 2010, plaintiff sent a "Claim Initiation Form" to Verizon's Claims Review Unit, in which he argued that his NCSD should be January 6, 1986, not February 17, 1994, for the purpose of calculating his pension benefit. Verizon 56.1 Stat. at ¶¶ 35-36; Fleming Dec. at ¶ 16; Fleming Dec. Ex. F. The Claims Review Unit responded in a letter dated October 27, 2010 explaining Verizon's calculation of plaintiff's NCSD. Verizon 56.1 Stat. at ¶¶ 37-44; Fleming Dec. at ¶ 19; Fleming Ex. G. Plaintiff was given credit for his work with NYNEX

between January 6, 1986 through July 31, 1987 as well as a brief period of service to Verizon in 1994, but could not be given credit for other previous work that did not meet the requirements set forth in the pension plan. Fleming Dec. ¶¶ 12, 22, 23, 24, 25; Fleming Ex. G.

II. Discussion

A. Standard of Review

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted).

"A fact is material when it might affect the outcome of the suit under governing law." Id. An issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried. * * *. If the nonmoving party does not so respond, summary judgment will be entered against him." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible * * *, or upon the mere allegations or denials of the [nonmoving] party's pleading." Id. (internal quotation marks and citations omitted).

B. Analysis

1. Claims Against Verizon

Plaintiff has withdrawn or abandoned all claims against Verizon except: (1) failure to accommodate in violation of the ADA; and (2) retaliation in violation of the FMLA. See Taylor v. City of N.Y., 269 F.Supp.2d 68, 75 (S.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

a. Failure to Accommodate

A party may violate the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). In order to establish a prima facie case of disability discrimination arising out

9

of a failure to accommodate, plaintiff must show that:

> (1) "[P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [his] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."

Id. at 97 (quoting Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006)). "In the context of the ADA, reasonable accommodation may include, inter alia, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" Id. (quoting 42 U.S.C. § 12111(9)(B)). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment . . . ." Id.

Verizon argues that plaintiff cannot satisfy the fourth element of his prima facie case because it did provide him with "reasonable" accommodations. As discussed below, there appear to be three (3) requested accommodations at issue: (1) an assignment to the midnight tour; (2) an ergonomically designed chair for use at plaintiff's desk; and (3) "scheduling flexibility with respect to [plaintiff's] day tour assignment." Pl. Opp. at 16.[9]

        i.    Requests to be Assigned to Midnight Tour and for "Scheduling Flexibility"

Plaintiff concedes that Verizon adequately accommodated him until the summer of 2007, but claims that "trouble hit" at that time. Pl. Opp. at 16. After returning from his twelve (12)-

---

[9] "Scheduling flexibility" presumably refers to plaintiff's request to begin his day tour at 5:30 a.m., rather than at 6:00 a.m.

10

week FMLA leave in 2007, plaintiff was informed that he would be removed from the midnight tour and reassigned to the day tour beginning at 8:00 a.m. In accordance with plaintiff's request, he was then placed on a specially modified day tour beginning at 6:00 a.m.

Plaintiff argues that the 6:00 a.m. start time was not a sufficient accommodation because it still resulted in an "extended" commute. Pl. Ctrstmt. at ¶ 57. However, according to plaintiff's testimony, he could "avoid all of the traffic" by arriving at his office at 5:30 a.m., a half hour before his shift began. Plaintiff's Exhibit A [Docket Entry No. 136] at 240:5-21. Thus, there does not appear to be any legitimate dispute that a shift beginning at 5:30 a.m. would have been a "reasonable accommodation"; rather, plaintiff argues that Verizon failed to accommodate him by requiring him to start work a half hour later.

The ADA "does not require the employer to provide every accommodation a disabled employee may request . . . ." D'Eredita v. ITT Corp., 370 Fed. Appx. 139, 141 (2d Cir. 2010). The accommodation provided, however, must be "reasonable." Id.; see also Querry v. Messar, 14 F.Supp.2d 437, 445 (S.D.N.Y. 1998) ("An employer need only offer 'a reasonable accommodation'; it need not provide the employee with the accommodation of her choice."). "Determining whether a particular commuting accommodation is reasonable normally involves a fact-specific inquiry." Nixon-Tinkelman v. New York City Dept. of Health & Mental Hygiene, 434 Fed. Appx. 17, 19 (2d Cir. 2011).

Verizon's reassignment of plaintiff to a specially modified day tour beginning at 6:00 a.m. was a reasonable accommodation for his disability. Plaintiff has shown no particular reason (other than personal preference) why he needed to work the midnight tour, rather than a modified day tour. According to plaintiff's deposition testimony, he could "avoid all of the traffic," Pl. Ex.

11

A at 240:13-21, and therefore enjoy the same benefit of working nights, by timing his trip to arrive at the office by 5:30 a.m. Even assuming that plaintiff needed to arrive at work a half-hour early to beat the morning traffic, he has not shown that this relatively minor inconvenience made Verizon's accommodation (*i.e.*, a shift beginning at 6:00 a.m.) unreasonable. At most, plaintiff suggests that he was bored during the half hour between his arrival at work and the beginning of his shift. Pl. Ex. A at 240:16-21 ("I was still having to arrive at work at 5:30 in the morning to avoid all of the traffic, and then I sat there for a half hour and twiddled my thumbs . . . ."); 241:10-15 ("So I sat there at my desk every day at 5:30 in the morning because I had to arrive earlier due to heavy traffic."). As plaintiff has not shown that Verizon failed to provide him with a reasonable accommodation that would permit him to perform the "essential functions" of his job, summary judgment is granted to Verizon. See Francis v. Runyon, 928 F. Supp. 195, 206 (E.D.N.Y. 1996) ("That the employer could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that . . . additional accommodations were necessary.").

Furthermore, Verizon has also shown that an assignment to the midnight tour would have been unreasonable because it would have violated the employee collective bargaining agreement in effect at the time. It is undisputed that the collective bargaining agreement between plaintiff's union and Verizon required that employee tour preferences be assigned in accordance with the employee's seniority. Garcia Dec., Ex. A at 41. In the fall of 2007, however, plaintiff was not sufficiently senior to receive a spot on the midnight tour. See Verizon's Memorandum in Reply [Docket Entry No. 140] at 7. "Barring a showing of extraordinary circumstances, the ADA does not require an employer to disregard the entitlements of other employees in order to offer a

12

reasonable accommodation to a disabled employee." Stamos v. Glen Cove School Dist., 78 Fed. Appx. 776, 778 (2d Cir. 2003) (citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 405, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)); see also Kravar v. Triangle Servs., No. 06-cv-07858, 2009 WL 805807, at *6 (S.D.N.Y. Mar. 27, 2009) ("[T]he ADA generally does not require an employer to provide an accommodation that would violate a collective bargaining agreement."); Kalsi v. New York City Transit Auth., 62 F.Supp.2d 745, 760 (E.D.N.Y. 1998).

ii. Request for Ergonomically Designed Chair

Next, it undisputed that Verizon *did* order an ergonomic chair for plaintiff, which arrived at his office several days after he left work. Pl. Ctrstmt. at ¶ 68. The Court will therefore interpret plaintiff's claim to be that Verizon failed to provide this accommodation in a timely manner, not that it failed to provide the accommodation at all.

To demonstrate that the delay in accommodation violated the ADA, plaintiff must "prove that the delay was motivated by discriminatory intent." De La Rosa v. City of New York Police Dept., No. 09 Civ. 5290, 2010 WL 4177626, at *9 (S.D.N.Y. Oct. 22, 2010) (citing Lyman v. City of New York, No. 01 Civ. 3789, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003)). Plaintiff has presented no such evidence of discriminatory intent in this case. On the contrary, the evidence submitted indicates only that Verizon processed his request expeditiously, even if it did take several months for the chair to arrive. As plaintiff has failed to show that Verizon failed to provide him with reasonable accommodations, or that any delay in providing those accommodations was motivated by discriminatory intent, summary judgment with respect to plaintiff's ADA claim is granted.

b.  FMLA Retaliation

Next, plaintiff claims that Verizon retaliated against him in various ways for taking FMLA leave. Pl. Ver. Opp at 7-14. "Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, the claim is evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Kim v. Goldberg, Weprin, Finkel Goldstein, LLP, --- F.Supp.2d ----, 2012 WL 1632739, at *4 (S.D.N.Y. May 4, 2012). Thus, in order to make out a prima facie case, plaintiff must show: (1) that he exercised rights protected under the FMLA; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).

As an initial matter, the parties dispute whether this claim is time-barred. See Pl. Opp. at 6-7. "To be timely, suits under the FMLA must be filed within two years of the last occurrence constituting an alleged violation of the act, unless the violation was 'willful,' in which case the limitations period is extended to three years." Higgins v. NYP Holdings, Inc., 836 F.Supp.2d 182, 191, (S.D.N.Y. 2011) (citing 29 U.S.C. § 2617(c)(1)-(2)). The Court cannot conclude at this stage that plaintiff's FMLA claim is barred by the statute of limitations. Nevertheless, summary judgment must be granted because plaintiff has shown neither an adverse employment action nor any circumstances raising a reasonable inference of retaliatory intent.

"For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." Millea v. Metro-North R.R. Co., 658 F.3d 154, 164 (2d Cir.

14

2011). Plaintiff has identified three (3) actions that were purportedly "adverse" to him: (1) the "unsubstantiated deduction of more than eight (8) years" from his NCSD; (2) his reassignment to the day tour; and (3) the fact that he did not receive the ergonomic chair he requested before leaving work. Pl. Opp. at 8.

As for the first, plaintiff has not presented evidence that Verizon actually recalculated his NCSD during or after his 2007 FMLA leave. Verizon argues that it calculated plaintiff's NCSD to be February 17, 1994 as long ago as September 2000, well before plaintiff took leave, Verizon 56.1 Stat. at ¶ 34, and has submitted several internal documents supporting that contention. Ver. Def. 56.1 Stat. at ¶ 45; Fleming Dec. ¶ 15; Fleming Ex. C (service record work sheet created in or around September 2000); Fleming Ex. E (attachment to letter dated August 16, 2006); Garcia Dec. ¶10; Garcia Ex. B (seniority list created prior to June 2007). Although plaintiff has submitted two (2) documents noting an NCSD of January 6, 1986, Plaintiff's Exs. F, H [Docket Entry No. 136], the origin of these documents is unclear; one is a "work restriction claim" mailed to MetLife and one appears to be a handwritten vacation schedule prepared by plaintiff's union in 2002. There is nothing to indicate that these documents did not rely upon the same mistaken NCSD calculated by plaintiff's labor union. In the face of the documentary evidence and affidavits produced by Verizon, these documents fail to raise an issue of fact as to whether plaintiff's NCSD was actually changed in 2007. As such, there is no evidence of an "adverse action."

Nor did plaintiff's reassignment from the midnight tour to a specially modified day tour constitute an "adverse action." Again, plaintiff has not shown that he had any medical need to work the midnight tour, as opposed to the early morning day tour. Although plaintiff was

15

disappointed with the shift change because he had a personal preference for working nights, this does not amount to an adverse action. See generally Johnson v. Eastchester Union Free Sch. Dist., 211 F.Supp.2d 514, 518 (S.D.N.Y. 2002).

Finally, Verizon did arrange for the delivery of an ergonomic chair, which was apparently en route to plaintiff's office when he left work in February 2008. Plaintiff has cited no authority to support the proposition that a delay in delivery amounts to an action that would "likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights."

Furthermore, even if any of these actions could be considered "adverse," plaintiff has not shown that they occurred under circumstances giving rise to an inference of retaliatory intent. In an FMLA retaliation case, such an inference can be established "when there is a basis for a jury to conclude that 'a causal connection [exists] between the plaintiff's protected activity and the adverse action taken by the employer.'" See Donnelly v. Greenburgh Cent. School Dist. No. 7, --- F.3d ----, 2012 WL 3240409, at *17 (2d Cir. Aug. 10, 2012) (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003)). Plaintiff's reassignment occurred only after Verizon identified what it believed to be an error in plaintiff's NCSD calculation; there is simply nothing in the record to indicate any causal relationship between the reassignment and his medical leave. See Ben-Levy v. Bloomberg, L.P., No. 11 Civ. 1554, 2012 WL 2477685, at *10 (S.D.N.Y. June 26, 2012) (unsupported, conclusory assertions of FMLA retaliation do not create issue of fact).

2. Claim Against Doctor Weiland

Plaintiff also claims that Doctor Weiland's examination report was fraudulent, leading to

16

a delay in his receipt of short-term disability benefits.[10] In short, plaintiff argues that Weiland committed fraud because his medical examination was not truly "independent," and that he falsified his report in order to provide a basis for denying plaintiff's application for disability. See Pl. Opp. [Docket Entry No. 123] at 5-9.

Summary judgment is granted with respect to this claim, as well. "Under New York law, for a plaintiff to prevail on a claim of fraud, he must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir.1997). "Each element of the fraud claim must be shown by clear and convincing evidence, at the summary judgment stage as well as at trial." Century Pacific, Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 219 (S.D.N.Y. 2007). Clear and convincing evidence may be circumstantial, but is "evidence that makes the fact to be proved 'highly probable.'" Id. (citations omitted).

There is simply no evidence of any material misrepresentation or omission by Weiland, much less one made with knowledge of its falsity or an intent to defraud. As evidence of fraudulent conduct, plaintiff highlights the following facts: (1) that Weiland dictated his report over the phone, rather than drafting the report himself; (2) that Weiland failed to produce a "physical copy" of his report during discovery; (3) that plaintiff was "instructed" to reschedule his IME with MetLife, rather than directly with Doctor Weiland's office; (4) that MetLife

---

[10] The Court considers plaintiff's medical malpractice claim to have been abandoned because plaintiff has not addressed the issue in his opposition brief.

provided Weiland with certain guidelines for conducting the examination and preparing his report; and (5) that Weiland's conclusions differed from those of another doctor. See Pl. Opp. at 5-8.

Nothing that plaintiff identifies would indicate that Doctor Weiland's report was based upon anything other than his own medical judgment. Even if plaintiff did show that statements in the report were incorrect, and he does not, there is no evidence of intent to defraud sufficient to defeat defendant's motion for summary judgment. See generally Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (non-moving party may not defeat summary judgment motion with "unsubstantiated speculation.").[11]

III. Conclusion

For the foregoing reasons, defendants' motions for summary judgment are GRANTED.

**IT IS SO ORDERED.**

s/ Sandra J. Feuerstein
_____
Sandra J. Feuerstein
United States District Judge

Dated:     September 6, 2012
           Central Islip, New York

---

[11] Defendant also argues that plaintiff cannot establish his reliance upon any material misrepresentation or omission because any such communications were made to MetLife, not to plaintiff himself. A number of state and federal courts have addressed the question of whether common law fraud may be based upon reliance by a third party, but the law on the issue is somewhat unsettled. See Chevron Corp. v. Donziger, --- F.Supp.2d ----, 2012 WL 1711521, at *17 (S.D.N.Y. May 14, 2012) (describing conflicting conclusions in state and federal courts). However, the Court need not, and does not, reach this issue for purposes of deciding the instant motion.

18